# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE RAMIREZ, | Case No. 1:18-cv-01322-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | (ECF Nos. 15, 19, 20) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

## I.

## INTRODUCTION

Jesse Ramirez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from morbid obesity, bilateral knee meniscal tears, thoracic degenerative joint disease, cervical degenerative disc disease, asthma, anxiety, and depression. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

///

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 7, 8.)

## II.

## BACKGROUND

### A.    Procedural History

Plaintiff filed a Title XVI application for supplemental security income on October 14, 2014.  (AR 293.)  Plaintiff's application was initially denied on January 9, 2015, and denied upon reconsideration on June 17, 2015.  (AR 205-209, 211-215.)  On September 17, 2015, Plaintiff requested hearing before an Administrative Law Judge, however, Administrative Law Judge Sharon Madsen (the "ALJ") dismissed Plaintiff's request on November 12, 2015, finding the request was untimely.  (AR 200-201.)  The Appeals Council overturned the dismissal of the hearing request and ordered the ALJ to give Plaintiff an opportunity for a hearing.  (AR 202-204.)  Plaintiff appeared for a hearing before ALJ Madsen on February 2, 2017.  (AR 136-164.)  On November 15, 2017, the ALJ issued a decision finding that Plaintiff was not disabled.  (AR 62-76.)  On August 27, 2018, the Appeals Council denied Plaintiff's request for review.  (AR 1-9.)  Plaintiff filed the instant action on September 25, 2018.  (ECF No. 1.)  On May 13, 2019, Plaintiff filed a brief in support of remand.  (ECF No. 15.)  Following a stipulated extension, Defendant filed a brief in opposition on July 18, 2019.  (ECF No. 18, 19.)  On July 29, 2019, Plaintiff filed a reply brief.  (ECF No. 20.)

### B.    Hearing Testimony

Plaintiff testified at the February 2, 2017 hearing without the assistance of counsel.  (AR 138-140.)  Plaintiff is 5'6" and weighs approximately 185 pounds.  (AR 143.)  Plaintiff is right handed.  (Id.)  Plaintiff is married with two kids at home, aged sixteen and eighteen.  (Id.)  Plaintiff has a total of seven kids, and sixteen grandkids.  (AR 146.)  Plaintiff has a tenth-grade education and has not had any vocational training or taken any college classes.  (AR 145.)  Plaintiff's reading and writing skills are not that good.  (Id.)

Plaintiff has difficulty dressing and putting things on such as pants and underwear.  (Id.)  Plaintiff does not do any household chores, does no cooking, and no shopping.  (AR 145-146.)  Plaintiff goes to church.  (AR 146.)  Plaintiff visits with family and friends, and his kids and grandkids visit.  (Id.)  On a typical day, Plaintiff spends time with his wife, then he takes his son

to school on the transit bus.  (Id.)  Plaintiff watches television and takes naps.  (Id.)  Plaintiff states he goes to some activities with his 16-year-old son, such as games.  (AR 147.)  Plaintiff does not have a driver's license and has a friend assist him with getting to places.  (AR 144-145.)

Plaintiff experiences constant back pain through the entire back extending to the hips and left leg.  (AR 151.)  Plaintiff drags his leg when he walks.  (Id.)  A doctor told Plaintiff that he had three deteriorating discs and recommended surgery, but Plaintiff stated: "they really haven't got back to me or anything."  (AR 152.)  Plaintiff had a nerve conduction study which showed his nerves are doing bad.  (Id.)  When asked which position is most uncomfortable between sitting, standing, or walking, Plaintiff stated he is always switching between sitting and walking, but that it hurts his lower back when he steps.  (AR 152-153.)  When the pain is bothering him, he tries to walk a little bit.  (AR 153.)  Plaintiff states he sleeps on the floor.  (Id.)  It sometimes hurts when Plaintiff breathes.  (Id.)  Plaintiff has his son help him tie his shoes, and so now uses slip-on shoes.  (AR 157.)  Plaintiff cannot climb stairs and gets pain right away in the knees.  (Id.)  This causes difficulty in going into his son's upstairs apartment.  (Id.)

Plaintiff does not use any over the counter medication, does not use heat or ice, and does not use creams.  (AR 153-154.)  Plaintiff states he receives shots for pain in his back.  (AR 154-155.)  Plaintiff had an epidural injection but said it did not work.  (AR 151-152.)  Plaintiff has only taken the pain medication Gabapentin however it does not help.  (AR 153.)  Plaintiff is diabetic, and his blood sugar goes up and down, and sometimes he gets dizzy.  (AR 154.)  Plaintiff has high blood pressure and believes it gets higher with the back pain.  (Id.)

Plaintiff can lift and carry five or ten pounds.  (AR 155.)  Plaintiff can sit for 25 minutes before he must stand up.  (Id.)  Plaintiff can stand for about 25 minutes before he must sit down.  (Id.)  Plaintiff says he cannot walk without his walker, and uses the walker in the house, but not when bathing.  (AR 156.)  Plaintiff can walk about one block with the assistance of the walker.  (Id.)  Plaintiff was unsure about how long he had been using the walker, but confirms it was prescribed by Dr. Welden, and he has been using it for a while.  (Id.)

Plaintiff confirmed that he has some problems learning, reading, and writing, and states it stems from a head injury.  (AR 158.)  Plaintiff received special help while in school.  (Id.)

1  Plaintiff cannot read a newspaper or writings like that.  (Id.)  Plaintiff testified he cannot read

2  street signs and has his wife help him with reading and spelling.  (AR 158-159.)

3         Plaintiff previously worked in the agricultural field thinning and picking fruit.  (AR 147.)

4  Plaintiff then worked with a flower company putting together bouquets.  (Id.)  Plaintiff worked

5  for a company detailing and cleaning buses.  (AR 148.)  Plaintiff worked at a donut shop.  (Id.)

6         The Vocational Expert Susan Moranda (the "VE") testified.  (AR 160-162.)  The ALJ

7  inquired about and confirmed which medical records needed to be updated, and closed the

8  hearing stating the agency would obtain the updated records.  (AR 148-150, 162-163.)  The ALJ

9  also informed Plaintiff that he would be referred for another consultative exam.  (AR 163.)

10        **C.     ALJ Findings**

11        The ALJ made the following findings of fact and conclusions of law:

12  •  Plaintiff has not engaged in substantial gainful activity since the application date of

13     October 14, 2014.

14  •  Plaintiff has the following severe impairments: lumbar degenerative disc disease, cervical

15     degenerative joint disease, obesity, diabetic neuropathy with type 2 diabetes mellitus, and

16     a learning disorder.[2]

17  •  Plaintiff does not have an impairment or combination of impairments that meets or

18     medically equals the severity of one of the listed impairments in 20 CFR Part 404,

19     Subpart P, Appendix 1.

20  •  Plaintiff has the residual functional capacity to perform a range of light work, and: (1)

21     can lift and carry twenty pounds occasionally and ten pounds frequently; (2) is able to

22     stand and walk six to eight hours and sit for six to eight hours in an eight-hour workday;

23     (3) can occasionally stoop, crouch, crawl, climb, kneel, and balance; (4) must avoid

24     concentrated exposure to uneven surfaces; and (5) is limited to performing only simple

25     routine tasks.

26  •  Plaintiff is unable to perform any past relevant work.

27  _____

28  [2]  The ALJ found that Plaintiff's hypertension and depression were not severe impairments as the evidence did not show more than a minimal impact on Plaintiff's ability to work.  (AR 67-68.)

- Plaintiff was born on October 26, 1963, and was 50 years old, which is defined as a an individual closely approaching advanced age, on the application date.
- Plaintiff has a limited education and is able to communicate in English.
- Transferability of job skills is not an issue in this case because the Plaintiff's past relevant work is unskilled.
- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.
- Plaintiff has not been under a disability, as defined in the Social Security Act, since October 14, 2014, the application date.

(AR 67-76.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

///

///

///

///

**IV.**

**DISCUSSION AND ANALYSIS**

**A.    The Parties' Primary Arguments**

Plaintiff argues the ALJ erred by rejecting the opinions of examining physicians in favor of outdated assessments from non-examining physicians which did not account for the majority of Plaintiff's updated medical records and clinical findings.  (Pl.'s Opening Br. ("Br.") 12, ECF No. 15.)  Plaintiff emphasizes the ALJ acknowledged the need for updated medical records in her opinion by holding the record open, requesting updated medical records, and sending Plaintiff for updated consultative internal medicine and psychological exams.  (Br. 12.)  In sum, Plaintiff argues that the four consultative examiner opinions that the ALJ assigned reduced weight to individually and collectively contradict the ALJ's RFC determination, which was based on outdated opinions, and thus the ALJ's rejection is not supported by specific and legitimate reasons, and remand is warranted.

Defendant argues the ALJ appropriately gave greater weight to the doctor opinions most consistent with the evidence in the record as a whole, and reduced weight to the opinions of the consultative examiners whose opined limitations were unsupported and inconsistent with the weight of the evidence in the record.  (Def.'s Opp'n Br. ("Opp'n") 10, ECF No. 19.)

**B.    The Legal Standards Applicable to Weighing Medical Opinions**

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).  "Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians.  Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2))[3]; see also Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) ("While the opinion of a treating physician is thus

---

[3]  The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. § 404.1501 et seq., however Plaintiff is seeking supplemental security income, 20 C.F.R. § 416.901 et seq.  The regulations are generally the same for both types of benefits.  Therefore, further references are to the disability insurance benefits regulations, 20 C.F.R. §404.1501 et seq.

entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician.").

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Garrison, 759 F.3d at 1012 (citing 20 C.F.R. § 404.1527(d)(3)). The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). "The weight afforded a non-examining physician's testimony depends 'on the degree to which [he] provide[s] supporting explanations for [his] opinions.' " Garrison, 759 F.3d at 1012 (citations omitted).

The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). It is the ALJ's responsibility to consider inconsistencies in a physician opinion and resolve any ambiguity. Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999). The ALJ can meet her "burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (quoting Cotton v. Bowen, 779 F.2d 1403, 1408 (9th Cir. 1989)).

**C.    Whether the ALJ Erred in Assigning Reduced Weight to the Consultative Examiners' Opined Physical Limitations**

Plaintiff argues the ALJ erred in assigning reduced weight to the consultative examiners Dr. Fabella and Dr. Hazrati who opined on Plaintiff's physical limitations.

1.    The Relevant Opinions Regarding Plaintiff's Physical Limitations

The Court will first summarize the relevant doctors' opinions regarding Plaintiff's physical limitations.

**a.    Dr. Fabella's December 2, 2014 Consultative Physical Examination**

Dr. Fabella performed a consultative exam on December 2, 2014.  (AR 462-466.)  Dr.

Fabella noted that he did not "have any medical records whatsoever on this claimant." (AR 462.) Dr. Fabella found Plaintiff to have "a normal gait and balance, and [did] not require the use of assistive devices for ambulation," though "did have mild difficulty getting up from a sitting position," and "mild difficulty of walking on his toes because of low back pain." (AR 464.) Examination of the lower back "show[ed] no spinal tenderness, but [Plaintiff] did have paralumbar muscle tenderness and spasm," "[s]traight leg raising test cause[d] localized low back pain bilaterally," and back "[r]ange of motion [was] decreased with forward flexion of only 60 degrees achieved." (AR 465.) All upper extremities and lower extremities exhibited normal range of motion bilaterally. (Id.) Plaintiff presented with '[l]ow back pain radiating down both legs with negative straight leg raising test, decreased range of motion due to pain, [] hypoactive knee deep tendon reflexes, [and] disc herniation with neural foraminal impingement" could not be ruled out. (AR 466.)

Dr. Fabella opined Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, could stand and walk four hours in an eight-hour workday, required breaks from sitting every thirty minutes, could occasionally climb, balance, kneel, and crawl, but was unable to walk on uneven terrain, climb ladders, work at heights, and should avoid cold exposure due to lower back pain. (Id.) Dr. Fabella also opined that no assistive devise was needed and found no limitations in the use of hands for fine or gross manipulation. (AR 466.)

b.    **Dr. Jackson's December 22, 2014 Non-Examining Physical RFC Assessment**

On December 22, 2014, non-examining state agency physician Dr. Jackson completed a physical RFC assessment. (AR 173-175.) Dr. Jackson found evidence of decreased range of motion, tenderness and spasms in the back, along with pain on the straight leg raising test, but also found normal gait, no use of assistive device for ambulation, normal lower extremity strength and sensation, no evidence of pain management, and found the consultative exam opinion's stand/walk limit of four hours was overly restrictive and appeared to be based on subjective complaints rather than exam findings. (AR 175.) Dr. Jackson opined Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, could stand and/or walk six hours in an eight-hour workday, could sit six hours in an eight-hour workday, could occasionally

climb ramps, stairs, ladders, ropes and scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl. (AR 173-174.) Dr. Jackson also found no manipulative, visual, or communicative limitations, no environmental limitations aside from a need to avoid concentrated exposure to hazards, and a limitation to occasionally dealing with uneven terrain. (Id.)

### c. Dr. Wong's June 1, 2015 Non-Examining Physical RFC Assessment

On June 1, 2015, non-examining state agency physician Dr. Wong completed a physical RFC assessment. (AR 189-191.) Dr. Wong's opinion largely mirrors Dr. Jackson's in finding decreased range of motion, tenderness and spasms in the back, pain on straight leg raising test, normal gait, no use of assistive device for ambulation, normal lower extremity strength and sensation, no evidence of pain management, and in opining that the consultative exam opinion's stand/walk limit of four hours was overly restrictive and appeared to be based on subjective complaints rather than exam findings. (AR 191.) Dr. Wong opined Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, could stand and/or walk six hours in an eight-hour workday, could sit six hours in an eight-hour workday, could occasionally climb ramps, stairs, ladders, ropes and scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl. (AR 189-190.) Dr. Wong also found no manipulative, visual, or communicative limitations, and no environmental limitations aside from a need to avoid concentrated exposure to hazards and a limit to occasionally dealing with uneven terrain. (Id.)

### d. Dr. Hazrati's March 27, 2017 Consultative Physical Examination

Dr. Hazrati performed a consultative physical exam on March 27, 2017. (AR 738-742.) Plaintiff was driven to the appointment and was found to be an adequate historian of his medical history. (AR 738.) Dr. Hazrati observed Plaintiff walked to the exam room limping on the left leg and using a walker, repositioned while sitting frequently, had difficulty getting on and off the exam table, and had difficulty putting on and taking off shoes. (AR 739.) Plaintiff had an unsteady gait, standing was positive, he could not hop or squat, and was limping and dragging his left leg when walking. (AR 740.) Dr. Hazrati noted that Plaintiff uses a walker correctly with both hands, that the walker appeared to have normal wear, that it was prescribed by his primary care provider, that he uses it all the time, and that ambulation without the device was

unsteady.  (Id.)  Plaintiff presented with decreased range of motion of the lumbar region, of the hips bilaterally, of the knees bilaterally, and of the shoulders, due to back pain.  (Id.)  Straight leg raising was positive on the left, and normal on the right.  (AR 741.)  Plaintiff had a paravertebral muscle spasm and tenderness over the lower back.  (Id.)  Plaintiff had motor strength of 4/5 on the left leg, but motor strength, muscle bulk and tone were otherwise normal.  (Id.)  Deep tendon reflexes were +1 on the left knee, and otherwise normal.  (Id.)

Dr. Hazrati diagnosed lower back pain and unsteady gait.  (AR 741.)  Dr. Hazrati opined Plaintiff could lift and carry only ten pounds frequently or occasionally due to decreased range of motion of the upper and lower extremities with increased risk of dropping objects and risk of falling due to unsteady gait.  (Id.)  Plaintiff could only stand and walk up to four hours in an eight-hour workday due to unsteady gait, could sit up to six hours in a workday, could frequently perform manipulative activities, and could do postural activities only occasionally due to decreased range of motion of the upper and lower extremities, weakness of the lower extremity, unsteady gait, and increased risk of falls.  (AR 741-742.)  Dr. Hazrati noted that Plaintiff "uses a walker which is medically necessary based upon my objective findings of unsteady gait, weakness of the lower extremity, and decreased range of motion of the lower extremity with increased risk of falls," and found the "[a]ssistive device is necessary for all distances and all terrain."  (AR 741.)  Dr. Hazrati also found Plaintiff should avoid unprotected heights or heavy machinery due to unsteady gait, decreased range of motion of the lower extremities, and weakness of the lower extremity with increased risk of falls.  (AR 742.)

2.     The ALJ did not Err in Assigning Reduced Weight to Dr. Fabella's Opinion

The ALJ assigned limited weight to Dr. Fabella's opinion stating:

> [I]t is not fully consistent with the medical and other evidence.  For example, a limitation to standing and walking only four hours in an eight-hour workday is inconsistent with physical limitations that routinely showed a normal gait [AR 582; AR 614, 646, 651].  The limitation is also inconsistent with Dr. Fabella's own finding of normal muscle bulk and tone with full motor strength and no focal motor deficits in the bilateral extremities [AR 465].  In addition, no objective evidence or clinical findings support a need to avoid cold or a need for a break every 30 minutes form [sic] sitting.  Accordingly, I discount and give only limited weight to this opinion.

(AR 71.)

Plaintiff contends the ALJ's reasons for rejecting Dr. Fabella's opinion are vague, not supported by the record, and thus cannot constitute specific and legitimate reasons supported by substantial evidence, specifically arguing: (1) Dr. Fabella's clinical findings on examination included difficulty getting up from a seated position and walking on toes due to back pain, paralumbar muscle tenderness and spasms, pain from straight leg raising bilaterally, and reduced range of motion in the lumbar spine, findings which the ALJ failed to provide reasons to adequately reject (AR 464-465); and (2) the evidence does not support the ALJ's finding that Plaintiff's gait was consistently normal and that Plaintiff could ambulate more than four hours in a workday, given Dr. Welden first prescribed a cane in December 2014, which Plaintiff argues the ALJ wholly failed to acknowledge, in addition to the fact that Plaintiff presented with antalgic gait to multiple physicians and underwent gait training in physical therapy, and the few references by the ALJ to normal gait or strength is not consistent with the longitudinal record as a whole (AR 471, 621, 699, 723, 739). (Br. 13-14.)

The Court first addresses Plaintiff's more direct challenges concerning the ALJ's citation to findings of normal gait and the contended failure of the ALJ to address Plaintiff's use of a cane or assistive device. The Court will then address Plaintiff's more general argument that the ALJ did not provide sufficient reasons to discount Dr. Fabella's clinical findings.

### a.    Plaintiff's Gait

The ALJ cited multiple records where Plaintiff presented with normal gait. The first is an exam with Dr. Welden on April 20, 2016. (AR 579.) The musculoskeletal exam found that Plaintiff had normal gait, lumbar spine tenderness, and mild pain with range of motion. (AR 582.) Dr. Welden ordered further diagnostic evaluations including lumbar spine MRI and referred to neurosurgery to treat and refer, and prescribed Toradol with follow-up after two weeks. (AR 582.) The ALJ's second citation is in fact the identical record based on the April 10, 2016 visit with Dr. Welden located in a different part of the administrative record. (AR 582, 614.)

The ALJ's third citation to normal gait refers to an earlier exam conducted by Dr. Welden on August 24, 2015. (AR 646-648.) Dr. Welden's musculoskeletal exam found that Plaintiff

had normal gait, lumbar spine tenderness, and moderate pain with range of motion. (AR 646.) Dr. Welden also noted Plaintiff presented with a pain level of 8 out of 10. (AR 646.) Dr. Welden assessed lumbago, noted "disability completed after seeing his LS spine MRI today," and noted Plaintiff requested a Toradol injection. (AR 646.)

The final reference is another earlier exam by Dr. Welden, dated August 11, 2015. (AR 649-653.) The musculoskeletal exam found that Plaintiff had normal gait, lumbar spine tenderness, and mild pain with range of motion. (AR 651.) Dr. Welden ordered a lumbar spine MRI and referred to a pain medicine doctor, with follow-up after two months. (AR 651.)

Thus, in sum, the ALJ cited three dates where Plaintiff presented with normal gait to Dr. Welden: August 11, 2015, August 24, 2015, and April 20, 2016. (AR 582, 646, 651.) On the other hand, Plaintiff emphasizes that he presented with antalgic gait to multiple physicians and underwent gait training in physical therapy. (Br. 14 citing AR 471, 621, 699, 723, 739.)

Plaintiff first cites Dr. Izzi's consultative psychological exam on December 2, 2014, where Dr. Izzi found Plaintiff's gait was "somewhat abnormal," during the mental status examination portion of the opinion. (AR 470-474.) Second, Plaintiff cites an exam conducted by Dr. Cruz on February 25, 2016, where Dr. Cruz found antalgic gait along with low lumbar tenderness on the right without masses or spasm, and assessed lumbar disc disease with radiculopathy. (AR 621.) Third, Plaintiff cites a physical therapy initial evaluation form dated December 18, 2014, which checks the box for gait training as a part of the plan of care. (AR 699.)[4] As correctly noted by the ALJ, Plaintiff "underwent some physical therapy . . . but was discharged because 'efforts to contact the patient to schedule appointments have been unsuccessful.'" (AR 70, 700.) Plaintiff also cites Dr. Hazrati's opinion which noted unsteady gait, (AR 739-740), an opinion appropriately weighed and discounted by the ALJ as discussed in the next section.

The Court notes that upon physical examination, Dr. Fabella in fact found Plaintiff to have "normal gait and balance, and [did] not require the use of assistive devices for ambulation."

---

[4] Plaintiff also cites another page from the physical therapy records, which notes unsteady gait in the fall risk assessment portion. (AR 723.)

(AR 464.)  Additionally, on May 1, 2018, an intake record states Plaintiff's chief complaint as dizziness and unsteady gait (AR 18), however the physical exam showed normal gait along with full range of motion (AR 21-22).

Based on the Court's review of the record cited by the ALJ and Plaintiff concerning gait, the Court finds the ALJ's reliance on findings of normal gait in the record is a specific and legitimate reason based on substantial evidence for assigning reduced weight to the opined limitations.  See Shephard v. Berryhill, 722 F. App'x 641, 643 (9th Cir. 2018) (holding ALJ "gave 'specific and legitimate reasons' for discounting Dr. Merrill's opinion that Shephard could not stand two hours a day or perform sedentary work," including citing "emergency room records documenting such things as normal ranges of motion and steady gait.")  Although there are some conflicts in the record, there is sufficient support for the ALJ's conclusion, and it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

### b.    Assistive Device

In arguing the ALJ improperly rejected Dr. Fabella's opinion, Plaintiff states "the ALJ's decision wholly fails to acknowledge" that "Dr. Welden first prescribed a cane to assist with ambulation in December 2014."  (Br. 13-14.)

On December 19, 2014, Plaintiff saw Dr. Welden.  The musculoskeletal findings did not specify whether Plaintiff's gait was normal or abnormal but did find lumbar spine tenderness and mild pain with range of motion.  (AR 521.)  The musculoskeletal findings showed a negative straight leg raising test, as well as the notation: "Pt req a 'cane.' "  (AR 516.)  The medication breakdown has a "cane" added on December 19, 2014, with directions to "use to help ambulation."  (AR 518.)

However, Dr. Fabella in fact stated in the portion pertaining to assistive devices: "[n]one needed."  (AR 466.)  Thus, Plaintiff's argument that the ALJ failed to consider the cane in assigning reduced weight to Dr. Fabella's opinion is not convincing as Dr. Fabella himself did

not state one was required, and thus there would be no strict necessity to address the cane in weighing Dr. Fabella's opinion. For this reason, the ALJ did not err by not mentioning the fact that Dr. Welden prescribed a cane on December 19, 2014, in weighing Dr. Fabella's opinion dated December 2, 2014, in which Dr. Fabella opined Plaintiff did not need an assistive device.

### c. The ALJ Sufficiently Reviewed the Clinical Findings and Objective Medical Evidence in Weighing Dr. Fabella's Opinion

The Court now turns to Plaintiff's more general arguments that the ALJ did not provide sufficient reasons to reject Dr. Fabella's clinical findings. In assigning greater weight to the state agency non-examining physicians, the ALJ stated:

> I credit and give significant weight to this opinion because it is consistent with the medical and other evidence. For example, it is consistent with and adequately accounts for the claimant's physical impairments, especially in light of an examination of the musculoskeletal system, which was negative for joint pain, joint swelling, and muscle weakness [AR 620]. The opinion is also consistent with physical examinations that routinely showed a normal gait [AR 582; AR 614, 646, 651] and with a straight leg raise test that was negative bilaterally [AR 533].

(AR 71-72.)

As Defendant emphasizes: (1) the ALJ's finding that Plaintiff could occasionally perform postural activities was consistent with all four of the doctor's opinions (AR 69, 174, 189-90, 466, 735, 741-774); and (2) the ALJ's finding that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently was consistent with three of the four doctors aside from Dr. Hazrati, who also assessed reaching and manipulative limitations no other physician endorsed (AR 69, 173, 189, 466, 732, 741-42). (Opp'n 12.) The ALJ also summarized the relevant medical evidence in a longitudinal fashion and provided the following conclusions concerning those aspects of the record which the ALJ found conflicted with greater limitations, including: (1) treatment reports showing pain with range of motion in the lumbar spine were only mild (AR 516, 525, 603); (2) a negative straight leg raise test bilaterally (AR 533); (3) Plaintiff had physical therapy but was discharged because "efforts to contact the patient to schedule appointments [were] unsuccessful" (AR 700); (4) physical exams showed normal gait (AR 582, 614, 646, 651); (5) an x-ray of the spine showed degeneration but with only mild changes, and

while there was encroachment upon the mid and lower neural foramina, it was early and the cervical spinous processes were unremarkable (AR 550, 577, 676)[5]; (6) there were not many complaints of neck pain and a December 2014 exam showed normal range of motion in the shoulders, elbows, wrists, and hands (AR 465)[6]; (7) examinations of the extremities in August of 2016 and February of 2017 were unremarkable (AR 592, 609); (8) numbness of the feet only occurred occasionally (AR 570); and (9) while Plaintiff is obese, musculoskeletal exams were negative for joint pain, joint swelling, and muscle weakness (AR 620). (AR 70.)

The Court has reviewed these records and finds the ALJ's references and descriptions are accurate, and Plaintiff does not challenge any of the factual basis behind ALJ's specific conclusions concerning the medical record, aside from the general argument that the longitudinal record demonstrates greater restrictions as a whole. In this regard, Plaintiff argues clinical findings support the consultative examiners, including severe degenerative changes in the lower thoracic spine and lumbar spine (AR 458, 491, 548-49, 550), pain with range of motion of the spine (AR 478-80, 493, 521, 559, 626-27, 641), decreased strength in the lower extremities (AR 478-80, 621), physical distress (AR 557), paraspinal muscle tenderness (AR 559, 621, 626-27), positive straight leg raise (AR 559, 570), and rigidity, guarding, and trigger point pain (AR 559). (Br. 15.) However, these records, when reviewed in conjunction with the ALJ's summary of the evidence above, only demonstrate conflicts in the medical record. The ALJ can meet the burden of providing specific and legitimate reasons supported by substantial evidence for rejecting a physician opinion "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings." Magallanes, 881 F.2d at 751 (quoting Cotton, 779 F.2d at 1408). Thus, while Plaintiff disagrees with the

---

[5] The ALJ's three citations are to the same November 16, 2015 x-ray, which showed the following: (1) no evidence of fracture or misalignment; (2) spasm with irritability of mild to moderate degree, definite decrease, almost lost off cervical curvature; (3) some mild early degenerative change with small osteophyte formation anteriorly and posteriorly with posterior resulting in some disk space narrowing; (4) disk space narrowing confirmed by swimmer's view and some early encroachment upon mid and lower neural foramina due to osteophyte formation, which may be resulting in some early components of spinal stenosis; (5) cervical spinous processes were unremarkable; and (6) precervical soft tissue regions not abnormally widened. (AR 676.) The record states that if clinical symptoms persist or worsen, a cervical MRI should be considered. (Id.)

[6] This citation refers to Dr. Fabella's examination which also found normal ranges of motion for the lower extremities. (AR 465.)

conclusions the ALJ reached from review of the medical evidence in the record, the ALJ adequately considered the longitudinal record as a whole (AR 70), weighed the conflicting doctors' opinions concerning physical limitations, and made a determination supported by substantial evidence in the record in assigning reduced weight to some of the opinions, and assigning greater weight to other opinions (AR 70-72). It is the ALJ's responsibility to resolve conflicts in medical testimony, resolve any ambiguity, with part of that responsibility being "[d]etermining whether inconsistencies are material . . . and whether certain factors are relevant to discount[ing] the opinions" of the doctors. Morgan, 169 F.3d at 603.

As the Court found above, the ALJ's reference to findings of normal gait was a specific and legitimate reason supported by substantial evidence for rejecting Dr. Fabella's opined limitations. Further, Plaintiff does not specifically challenge the ALJ's other reasons for rejecting Dr. Fabella's opinion, including that the limitations were "inconsistent with Dr. Fabella's own finding of normal muscle bulk and tone with full motor strength and no focal motor deficits in the bilateral extremities [AR 465]," and that "no objective evidence or clinical findings support a need to avoid cold or a need for a break every 30 minutes form [sic] sitting." (AR 71.)

For the above stated reasons, the ALJ did not err in assigning reduced weight to Dr. Fabella's opined limitations.

3. The ALJ did not Err in Assigning Reduced Weight to Dr Hazrati's Opinion

The ALJ assigned "very little weight" to Dr. Hazrati's opinion for the following reasons:

> [I]t is inconsistent with the medical and other evidence. For example, the exertional limitations are inconsistent with reports showing he ambulated with a normal gait [AR 582, 614, 646, 651] and with examinations of the extremities which were unremarkable [AR 592, 609]. A limitation to frequently performing postural activities is also inconsistent with Dr. Hazrati's own examination findings, which showed a normal range of motion in the hands and wrists with full motor strength in the bilateral upper extremities [AR 741].[7] Furthermore, no

---

[7] Dr. Hazrati in fact opined that Plaintiff could perform postural activities occasionally, not frequently (AR 741-742), and the parties briefing does not clearly address whether this is a typographical error in the ALJ's opinion. The ALJ found that Plaintiff was limited to occasional postural activities in apparent agreement with Dr. Hazrati's opinion in this regard. (AR 69.) To the extent that the ALJ meant to criticize Dr. Hazrati's finding an occasional limitation of postural activities as internally inconsistent, and thus an additional basis for discounting the opinion even though an occasional limitation would be in line with the ultimate RFC determination by the ALJ, such finding would have been an additional specific and legitimate reason for giving reduced weight to Dr. Hazrati's opinion as a

17

objective evidence supports the need for a walker, as it was given to him because he requested it [AR 641]. In addition, the opinion is discounted because Dr. Hazrati places a great deal of emphasis on an "unsteady gait" as the reason for most of his limitations [AR 741-742]. However, this alleged gait instability is not found elsewhere in the record, as treatment reports routinely showed a normal gait [AR 582, 614, 646, 651] and as previously stated, while he was given a walker, it was pursuant to his request [AR 641]. Accordingly, I discount this opinion and afford it very little weight because the objective medical evidence indicates and supports a finding that the claimant is more capable.

(AR 71.)

Plaintiff argues the ALJ's conclusion that that the opined limitations were inconsistent with records of normal gait and Dr. Hazrati's own findings is counter to Plaintiff repeatedly demonstrating antalgic gait, the fact that he was prescribed a walker and a cane, and fails to acknowledge Dr. Hazrati's clinical findings and explanation for these limitations including the fact that Plaintiff exhibited difficulty getting on and off the exam table and in taking off and putting on shoes, that he repositioned repeatedly while sitting, displayed unsteady gait with left leg drag, decreased range of motion in the lumbar spine decreased range of motion in the hips bilaterally, decreased range of motion in the knees bilaterally, decreased range of motion in the shoulders from back pain, straight leg raise testing positive on the left, seated and supine, paravertebral muscle spasm and tenderness over the low back, reduced hip strength on the left at 4/5, and reduced reflex on the left knee. (Br. 14, citing AR 739-741.)

As the Court found above, based on the Court's review of the records cited by the ALJ and Plaintiff concerning Plaintiff's gait, the ALJ's conclusion is a specific and legitimate reason based on substantial evidence for assigning reduced weight to the opined limitations. See Shephard, 722 F. App'x at 643. The ALJ's conclusion that the exertional limitations are inconsistent with the findings of normal gait in the record, along with the ALJ's statement that "the opinion is discounted because Dr. Hazrati places a great deal of emphasis on an 'unsteady

whole, when taken in conjunction with the other reasons the ALJ gave for giving reduced weight to the opinion. See Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("The incongruity between Dr. Nachenberg's Questionnaire responses and her medical records provides an additional specific and legitimate reason for rejecting Dr. Nachenberg's opinion of Tommasetti's limitations."); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) ("We hold that the ALJ properly found that Dr. Magsarili's extensive conclusions regarding Connett's limitations are not supported by his own treatment notes."); Shephard v. Berryhill, 722 F. App'x at 643 (ALJ gave specific and legitimate reasons for discounting medical opinions including records documenting normal ranges of motion, and lack of support from doctor's own examination findings).

gait' as the reason for most of his limitations," are thus valid reasons for discounting the opined limitations in favor of the other medical opinions in the record. (AR 71.)

The ALJ also found exertional limitations were not consistent with examinations of the extremities which were unremarkable (AR 71), citing to: (1) Dr. Welden's August 31, 2016 exam which found normal extremities (AR 609); and (2) Dr. Welden's February 17, 2017 exam finding normal extremities (AR 592).[8] While the ALJ only cited these two findings, in briefing, Defendant identifies other records demonstrating findings of normal extremities upon clinical examination. The Court has reviewed these records which include the following clinical exam findings by Dr. Welden: (1) normal gait, normal extremities, and lumbar tenderness with mild pain on range of motion on January 19, 2017 (AR 597); (2) normal extremities, negative straight leg test bilaterally, and lumbar tenderness with mild pain on range of motion on November 17, 2016 (AR 603); (3) normal extremities and lumbar tenderness with mild pain on range of motion on August 31, 2016 (AR 609); (4) normal gait, normal extremities, and lumbar/cervical tenderness with mild pain on range of motion on November 23, 2015 (AR 626); (5) normal extremities, and lumbar tenderness with mild pain on range of motion on September 23, 2015 (AR 636); (6) normal extremities and lumbar tenderness with moderately reduced range of motion on September 16, 2015 (AR 641); (7) normal gait, normal extremities, and lumbar tenderness with moderate pain with range of motion on August 24, 2015 (AR 646); (8) normal gait, normal extremities, and lumbar tenderness with mild pain on range of motion on August 11, 2015 (AR 651); (9) normal gait, normal extremities, and lumbar tenderness with mild pain on range of motion on June 10, 2015 (AR 656); and (10) normal gait, normal extremities, negative straight leg raise test with normal dorsiflexion in the feet, and lumbar tenderness with mild pain on range of motion on March 27, 2015 (AR 661). Like the ALJ's reliance on findings of normal gait in the record, the Court finds the ALJ's conclusion that the limitations were inconsistent with unremarkable examinations of the extremities is a specific and legitimate reason supported

---

[8]  The Court notes the close proximity in time between these findings and the consultative exam conducted by Dr. Hazrati on March 27, 2017, is an additional factor that weighs against Plaintiff's argument that the ALJ inappropriately disregarded the more up to date consultative exam in favor of outdated opinions and records.

by substantial evidence. See Shephard, 722 F. App'x at 643; Burch, 400 F.3d at 679 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

As to Plaintiff's more general arguments that the clinical findings and longitudinal record support Dr. Hazrati's opinions, and that the consultative exam was based on more recent medical records than the non-examining physician opinions, this argument fails for the same reasons the Court discussed above in relation to Dr. Fabella's opinion, supra Section IV(C)(2)(c). In sum, these records, when reviewed in conjunction with the ALJ's summary and analysis of the evidence as a whole, only demonstrate conflicts in the medical record, and while Plaintiff disagrees with the conclusions the ALJ reached, the ALJ adequately considered the longitudinal record as a whole (AR 70), weighed the conflicting doctor's opinions concerning physical limitations, and made a reasonable determination supported by substantial evidence in the record by assigning reduced weight to some of the opinions, and assigning greater weight to other opinions (AR 70-72). See Magallanes, 881 F.2d at 751; Morgan, 169 F.3d at 603.

Finally, while the ALJ's weighing of Dr. Hazrati's opinion is based on specific and legitimate reasons supported by substantial evidence, the Court is concerned with the ALJ's statement that "no objective evidence supports the need for a walker, as it was given to him because he requested it." (AR 71.) The ALJ's reference to Plaintiff's request for a walker stems from a doctor visit on September 16, 2015, in which the doctor notes in the record: "walker per pt's request," and "[w]aiting Spine Specialist Consultation." (AR 641.) The record also notes "PAtient requ [sic] a walker for his back. PAtient [sic] did not go to the lab, new order given this AM to go to thw [sic] Lab this AM[.] PAtient [sic] requesting a Toradol injection for pain." (AR 639.)

The Court finds that the ALJ's statement phrased in such an absolute manner appears illogical on its face, as the fact that a claimant may have requested a medical device does not directly equate to there being no objective medical evidence supporting the need for such device in the record. In his opinion, Dr. Hazrati specifically states: "[c]laimant uses a walker which is medically necessary based upon my objective findings of unsteady gait, weakness of the lower

extremity, and decreased range of motion of the lower extremity with increased risk of falls."
(AR 741.)  However, to the extent the ALJ's statement is illogical or is error, it would be
harmless as the ALJ provided multiple other specific and legitimate reasons for assigning
reduced weight to the opinion.  Further, the ALJ also stated: "this alleged gait instability is not
found elsewhere in the record, as treatment reports routinely showed a normal gait . . . and as
previously stated, while he was given a walker, it was pursuant to his request."  (AR 71.)  The
ALJ's use of the fact of Plaintiff requesting the walker here is a sufficiently specific and
legitimate reason based on substantial evidence when used in conjunction with the findings of
normal gait in the record.[9]  See Quesada v. Colvin, 525 F. App'x 627, 629 (9th Cir. 2013)
("Although Quesada stated that he used a cane and walker at times, neither item was medically
prescribed, and there was evidence that Quesada's use of a cane and walker was inconsistent
with his normal gait, good mobility, lack of neurological defects, and normal muscle strength.").

Finally, to the extent the ALJ erred in rejecting the standing/walking/sitting limitations
opined by either Dr. Fabella or Dr. Hazrati, such error would be harmless as explained in the
following section.

    4.    <u>Any Error Regarding the Standing/Walking/Sitting Limitation is Harmless</u>

Defendant argues that even if the ALJ erred in rejecting the standing/walking limitations
that Drs. Fabella and Hazrati assessed, such error would be harmless given the VE testified that a
hypothetical worker with Plaintiff's age, education, work experience, and RFC could perform
work, including mail and office assistant positions, even if Plaintiff needed to shift positions
between sitting and standing every fifteen minutes (AR 161-162).  (Opp'n 17-18.)  Plaintiff
counters that the error is not harmless because the vocational expert did not contemplate all of
the limitations identified by the examiners, including the use of an assistive device, and a more
limited ability to lift.  (Pl's Reply Br. ("Reply") 5, ECF No. 20.)

The first hypothetical person the ALJ presented to the VE included a sit/stand/walk

---

[9]  The Court notes that on May 1, 2018, an intake record shows Plaintiff "denie[d] using [an] assistive device for
ambulation."  (AR 18.)  Dr. Fabella also opined Plaintiff did not need an assistive device on December 2, 2014.
(AR 464, 466.)

limitation of six to eight hours. (AR 161.) The VE testified jobs as a mail clerk and cashier would accommodate such limitations and existed in the economy. (AR 161.) A second hypothetical allowed a sit/stand option at will, but no more than an hourly change of position, and the VE testified the mail clerk and general office assistant positions would accommodate these limitations and existed in the economy. (AR 161-162.) A third hypothetical allowed the sit/stand option with a change allowed every fifteen minutes, and the VE testified the office assistant and mail clerk positions would accommodate such limitations. (AR 162.)

The third hypothetical offered by the ALJ is in line with Dr. Fabella's opinion that Plaintiff could stand and walk four hours in an eight-hour workday and required breaks from sitting every thirty minutes (AR 466), and Dr. Hazrati's opinion that Plaintiff could only stand and walk up to four hours in an eight-hour workday due to unsteady gait, and could sit up to six hours in a workday (AR 741-742).

Based on the foregoing, the Court finds that as to the standing/walking/sitting limitations only, to the extent the ALJ erred in rejecting Dr. Fabella's or Dr. Hazrati's opined limitations, such error is harmless.

### D.   Whether the ALJ Erred in Assigning Reduced Weight to the Consultative Examiners' Opined Mental Limitations

Plaintiff argues the ALJ's rejection of the consultative examiners' opinions concerning mental limitations was error and an improper substitution of the ALJ's lay interpretation of clinical findings. (Br. 16.)

#### 1.   The Relevant Mental Assessments in the Record

The Court first summarizes the relevant mental exams and assessments which the parties emphasize in briefing.

#### a.   Dr. Izzi's December 2, 2014 Consultative Psychological Exam

Dr. Izzi performed a consultative psychological exam on December 2, 2014. (AR 470-474.) Plaintiff reported back problems, an inability to read or write, depression, and stated he is unable to do anything for his family. (AR 470.) Plaintiff reported that he mostly stays home during the day, his wife does the chores, he does not belong to clubs, he attends religious

services and sees friends occasionally, sees family regularly, has occasional problems with appetite, occasional sleeping difficulties, unprovoked crying spells, and reported occasional suicidal ideation but had no specific intent at the time. (AR 470-471.) No history of drug or alcohol abuse was reported, and auditory/visual hallucinations were denied. (AR 471.)

On exam, Dr. Izzi found Plaintiff was alert, appropriately dressed and groomed, arrived on time driven by a family member, had somewhat abnormal gait, had dysphoric mood/affect reporting feeling depressed, no speech or language problems observed, no indications of psychosis or schizophrenia, no apparent loss of contact with reality, and no hallucinations observed. (AR 471.) Memory function tests showed auditory, visual, and immediate memory in the extremely low range, and overall results suggested deficits in short-term auditory memory and short-term visual memory. (AR 472.) IQ testing placed Plaintiff in the bottom first percentile. (AR 473.) Overall test results showed intellectual functioning within the borderline range, with some subtest scores reaching the low average range. (Id.)

Dr Izzi diagnosed Plaintiff with an unspecified depressive disorder. (AR 472.) Dr. Izzi found Plaintiff's chronic pain was a predominant feature and Plaintiff's mood disorder would fluctuate as his subjective perception of pain fluctuates. (Id.) Dr. Izzi found the interview indicated Plaintiff did not have difficulty caring for basic hygiene and the evaluation suggests Plaintiff is capable of performing a simple and repetitive type task on a consistent basis over an eight-hour work period. (Id.) Dr. Izzi found Plaintiff's ability to get along with peers or supervisors in a work-like setting would be moderately limited by the mood disorder, with fluctuations possibly limiting Plaintiff's ability to perform a complex task on a consistent basis over an eight-hour period. (Id.) Dr. Izzi found that on a purely psychological basis, Plaintiff appeared capable of responding to usual work session situations regarding attendance and safety issues, and in dealing with changes in a routine work setting. (Id.) Plaintiff appeared capable of managing his own funds. (AR 474.)

### b. Dr. Ikawa's January 5, 2015 Non-Examining Mental RFC Assessment

On January 5, 2015, Dr. Ikawa completed a mental RFC assessment. (AR 175-176.) Dr. Ikawa opined Plaintiff could perform simple routine tasks, had a moderate limitation in ability to

understand and remember detailed instructions, and found no significant limitations in: (1) the ability to remember locations and work-like procedures; or (2) the ability to understand and remember very short and simple instructions. (Id.) As for sustained concentration and persistence limitations, Dr. Ikawa opined Plaintiff could perform simple routine tasks, found a moderate limitation in the ability to carry out detailed instructions, and found no significant limitations in: (1) the ability to carry out very short and simple instructions; (2) the ability to maintain attention and concentration for extended periods; (3) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) the ability to sustain an ordinary routine without special supervision; (5) the ability to work in coordination with or in proximity to others without being distracted by them; (6) the ability to make simple work-related decisions; and (7) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 176.) Dr. Ikawa found no societal interaction limitations and no adaptation limitations. (Id.)

### c.   Dr. Cool's June 16, 2015 Non-Examining Mental RFC Assessment

On June 16, 2015, Dr. Cool completed a mental RFC assessment. (AR 191-192.) Dr. Cool found the same understanding and memory limitations as Dr. Ikawa in addition to specifically finding that in regard to ability to learn, Plaintiff is unable to understand, learn and remember complex instructions, but would be able to learn 4 to 5 step tasks. (Id.) Dr. Cool also found the same sustained concentration and persistence limitations as Dr. Ikawa in addition to finding Plaintiff "does have some limitations due to his depression and anxious mood," which "will interfere somewhat with ability to concentrate on a sustained basis[,] [h]owever, he would be able to concentrate sufficient to attend to simple, routine tasks." (AR 192.) Like Dr. Ikawa, Dr. Cool also found no social interaction limitations and no adaptation limitations. (Id.) Dr. Cool concluded that from a psychological perspective, Plaintiff retained the capacity to perform simple routine tasks with adequate pace, persistence, and concentration. (Id.)

///

///

### d. Dr. Portnoff's April 10, 2017 Consultative Psychological Evaluation

Dr. Portnoff performed a consultative psychological evaluation on April 10, 2017. (AR 748-755.) Plaintiff reported a special education background and learning disabilities but not ADHD. (AR 749.) Drug and alcohol abuse were denied. (Id.) Plaintiff reported depression due to health issues, "without vegetative symptoms or suicidal ideas," and anxiety-worry without panic attacks or social anxiety. (Id.) Plaintiff denied hallucinations, mania, PTSD, OCD, counseling, or psychiatric hospitalizations. (Id.) Plaintiff sometimes needs help with showering, dressing, and grooming, but has adequate motivation for them, and cannot travel alone but can manage his own money. (Id.)

On exam, Plaintiff presented as adequately groomed, used a walker, had mild to moderate psychomotor discomfort, no abnormal movements, good eye contact with mildly reduced facial kinetics, speech was spontaneous, prompt, quiet and flattened, receptive language comprehension was grossly intact, the thought process as reflected in speech was coherent and organized but mildly impoverished, and Plaintiff's affect, as expressed in speech and demeanor, was characterized by mild tension. (Id.) Dr. Portnoff found Plaintiff alert and cooperative for testing so that findings were a valid representation of current cognitive status. (AR 749-750.)

Intelligence testing showed an overall mild impairment, and specifically, mild impairments in verbal comprehension, working memory, and processing speed, in addition to a marginal impairment in perceptual reasoning. (AR 750.) Memory testing demonstrated marginally impaired auditory memory, visual memory, immediate memory, and delayed memory. (Id.)

Dr. Portnoff's clinical findings showed a history of learning disabilities which likely contributed to test scores and were likely deflated by distractibility from chronic pain and mental slowing from mild depression. (AR 753.) Plaintiff had no reported deficits in instrumental activities of daily living from a mental standpoint which countered a finding of primary borderline intellectual functioning. (Id.) Cognitive testing indicated impairment in verbal and visual reasoning skills, working memory, processing speed, and immediate/delayed verbal visual memory. (Id.) Dr. Portnoff diagnosed an unspecified depressive disorder as well as an

unspecified learning disorder. (Id.)  Dr. Portnoff concluded that Plaintiff: (1) had no psychiatric restrictions in daily activities, does not need help with self-care, could cognitively but not physically travel alone, and could independently manage money; (2) had mild limitations in maintaining social functioning because of deficiencies in concentration, language skills, reasoning, memory, and mild depression; (3) had moderate difficulties with concentration, persistence, and pace, as measured by psychometrics; (4) had no reported history of repeated episodes of emotional deterioration in work-like situations; (5) could understand, carry out, and remember  simple instructions; (6) had moderate limitations in his ability to respond appropriately to co-workers, supervisors, or the public, because of deficiencies in conversational memory, in reasoning, in concentration, in language skills, and due to anxious depression; (7) had no limitations in his ability to respond appropriately to usual or routine work situations, such as attendance and safety; and (8) had mild limitations in his ability to deal with unexpected changes in a routine work setting, because of deficits in reasoning, and due to anxious depression.  (AR 753-754.)

2.  The ALJ did not Err in Assigning Reduced Weight to the Consultative Examiners' Opined Mental Limitations

The ALJ gave reduced weight to Dr. Izzi's opinion:

> I only give some weight to [Dr. Izzi's] opinion because it is not fully consistent with the medical and other evidence.  For example, no objective evidence supports a limitation on the ability to get along with others, as his speech was unremarkable, he made good eye contact, and abnormal involuntary movements were not discerned [AR 468-474, 749].  Furthermore, he reported to Dr. Izzi that he regularly sees family, occasionally attends religious services, and occasionally sees friends [AR 470].  Accordingly, I did not adopt any social limitations in my residual functional capacity finding, as there is no objective basis for them.  On the other hand, a limitation to performing only simple tasks is consistent with and adequately accounts for his learning disorder [AR 747[10]], especially in light of the lack of continuing psychiatric treatment and reports from primary care providers showing he was alert and oriented with an appropriate affect and intact judgment [AR 559].

(AR 72.)  The ALJ also assigned limited weight to Dr. Portnoff's opinion:

---

[10]  The ALJ's pincite here corresponds to AR 747 which is a blank page between Dr. opinions, and the Court assumes the ALJ was referring to the Dr. Portnoff's April 10, 2017 opinion which begins on the following page, AR 748.

Similar to the opinion of Dr. Izzi [AR 468-474] (discussed above), I afford only some weight to this opinion because it is not fully consistent with the medical and other evidence. For example, no objective evidence supports a moderate limitation on the ability to get along with others, as his speech was unremarkable, he made good eye contact, and abnormal involuntary movements were not discerned [AR 468-474; 749]. Furthermore, a moderate limitation in this area is internally inconsistent with Dr. Portnoff's own report and prior finding of only mild limitations in social functioning [AR 754]. However, as stated above a limitation to performing only simple tasks is consistent with and adequately accounts for his learning disorder [AR 747], especially in light of the lack of continuing psychiatric treatment and reports from primary care providers showing he was alert and oriented with an appropriate affect and intact judgment [AR 559].

(AR 73.) The ALJ assigned great weight to the opinions of non-examining state-agency physicians Dr. Ikawa and Dr. Cools:

I credit and give great weight to these opinions because they are consistent with the medical and other evidence. For example, they are consistent with and adequately account for the claimant's learning disorder [AR 747], especially in light of the lack of continuing psychiatric treatment. They are also consistent with reports from primary care providers showing he was alert and oriented times three with a stable mood, an appropriate affect and intact judgment [AR 559]. In addition, his lack of deficits in instrumental activities of daily living from a mental standpoint [AR 753] indicates no greater limitations are warranted. Accordingly, relying upon the overall evidence of record, including the findings and opinions of Drs. Ikawa [AR 175-176] and Cools [AR 192-193], I find the claimant is limited to performing only simple routine tasks, as that is most consistent with the evidence.

(AR 73.)

Plaintiff argues: (1) the ALJ's conclusion that there is no objective basis for the opined social limitations is contradicted by Dr. Izzi's clinical findings of dysphoric affect, poor memory, and pain reactions (AR 72, 470-73); and (2) the ALJ disregards Dr. Izzi's supportive clinical testing and explanation of opined limitations regarding mood disorder fluctuations, pain, and memory difficulties (AR 471-473). (Br. 16-17.) Plaintiff also argues that the ALJ's assertion there is no objective evidence supporting Dr. Portnoff's opined social limitations is contradicted by Plaintiff's presentation with psychomotor discomfort, quiet flattened speech, and impaired performance on clinical testing due to pain-related distractibility and depression (AR 748-754), and emphasizes that Dr. Portnoff explained Plaintiff's moderate limitation in ability to respond appropriately to co-workers, supervisors, and the public is directly connected to his deficiencies in conversational memory, reasoning, concentration, language skills, and his anxious depression

1   (AR 754).  (Br. 16-17.)

2       Defendant generally argues the ALJ's findings were supported by substantial evidence in

3   the record as a whole as: the ALJ's RFC assessment for simple routine tasks was consistent with

4   all four of the opinions from Dr. Ikawa, Dr. Cools, Dr. Izzi, and Dr. Portnoff (AR 176, 192, 472,

5   744, 754), and the ALJ's decision to not assess any social interaction limitations was consistent

6   with the opinions of the non-examining physicians and the record as a whole.  (Opp'n 19-20.)

7       a.    **The ALJ Provided Specific and Legitimate Reasons for Assigning Reduced**
              **Weight to the Consultative Examiner Opinions**
8

9       First, the ALJ's reliance on the fact that Plaintiff reported to Dr. Izzi that he regularly

10  sees family, attends church, and sees friends is a specific and legitimate reason supporting the

11  rejection of the opined social limitations.  See Shephard, 722 F. App'x at 643 ("The ALJ gave

12  specific and legitimate reasons for discounting Dr. Toews's opinion on Shephard's social

13  limitations and difficulty attending work," one of which was that "it was inconsistent with

14  Shephard's activities, which included interacting appropriately with friends and healthcare

15  providers.").  The Court notes that these types of social interactions were confirmed as ongoing

16  in hearing testimony when Plaintiff stated he goes to church, visits with family and friends, and

17  his kids and grandkids visit.  (AR 146.)  During the hearing, Plaintiff also testified that on a

18  typical day, he takes his son to school on the transit bus, and that he goes to some activities with

19  his son, such as games.  (AR 146-147.)  A lay witness testified that Plaintiff visits with family

20  and friends twice a week, goes to church twice a month, and does not have problems getting

21  along with family, friends, neighbors, or others.  (AR 342-343.)  Plaintiff does not dispute this

22  level of social interaction and does not challenge this basis for discounting this portion of Dr.

23  Izzi's opinion and it is valid and supported by substantial evidence.

24      Second, the ALJ's statement that Dr. Portnoff's opined moderate limitation in social

25  functioning is internally inconsistent with Dr. Portnoff's own report is a specific and legitimate

26  reason supported by substantial evidence for discounting the opined moderate limitation.  Within

27  the Medical Source Statement ("MSS") form, Dr. Portnoff opined that Plaintiff only has mild

28  limitations in the areas of interacting appropriately with the public, interacting appropriately with

                                            28

supervisors, interacting appropriately with co-workers, and in responding appropriately to usual work situations and to changes in a routine work setting. (AR 745.) Within Dr. Portnoff's related internal evaluation form, he opines that Plaintiff only has mild limitations in maintaining social functioning and in dealing with unexpected changes in a routine work setting, which is consistent with the MSS form, however states Plaintiff has moderate limitations in the ability to respond appropriately to co-workers, supervisors, or the public. (AR 754.) These internal inconsistencies are a specific and legitimate reason for the ALJ to reject the more restrictive opined moderate limitation in the ability to respond to co-workers, supervisors, or the public. See Fry v. Berryhill, 721 F. App'x 714, 715 (9th Cir. 2018) ("The ALJ provided several specific and legitimate reasons to give little weight to Dr. Dhawan's opinion [including] internal inconsistencies in the opinion."); Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("The incongruity between Dr. Nachenberg's Questionnaire responses and her medical records provides an additional specific and legitimate reason for rejecting Dr. Nachenberg's opinion of Tommasetti's limitations."); Morgan, 169 F.3d at 603 (stating "internal inconsistencies within [physician] reports, and the inconsistencies between their reports, also constitute relevant evidence," and the "ALJ is responsible for resolving conflicts in medical testimony, and resolving ambiguity.").

The ALJ provided other specific and legitimate reasons for rejecting the opinions. The ALJ's reliance on the fact that Plaintiff did not receive continuing psychiatric treatment as a reason to discount the mental limitations is a specific and legitimate reason, and Plaintiff does not directly challenge the factual basis of this reason. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("[T]he ALJ partially discredited Burch's testimony of depression and fatigue because she did not seek any treatment or evaluation . . . [t]he ALJ is permitted to consider lack of treatment in his credibility determination."); Matthew L. v. Comm'r of Soc. Sec., No. C18-5697-BAT, 2019 WL 2183611, at *3 (W.D. Wash. May 21, 2019) ("Plaintiff's lack of mental health treatment supports the finding that Dr. Gibson's opinion is uncorroborated by the record, which is a legitimate reason to discount the doctor's opinion."); Schriver v. Astrue, No. CV-10-286-JPH, 2011 WL 4054866, at *8 (E.D. Wash. Sept. 12, 2011) ("ALJ Payne discounted the

examining psychologist's contradicted opinion for specific, legitimate reasons [including] a complete lack of treatment.")

Additionally, the ALJ found milder limitations consistent with "reports from primary care providers showing he was alert and oriented with an appropriate affect and intact judgment." (AR 73.) In support, the ALJ cites a November 2015 record from Dr. Grandhe whose psychiatric exam showed Plaintiff appeared alert and oriented x3 with stable mood, and showed appropriate affect with no pain behavior and judgment intact. (AR 559.) Also, as cited in the ALJ's summary of the records pertaining to mental impairment, on June 9, 2014, Plaintiff did "not present with depressed mood, difficulty concentrating, difficulty falling asleep, diminished interest or pleasure, fatigue, feelings of guilt, loss of appetite, restlessness or thoughts of death or suicide." (AR 72, 455.) On February 25, 2016, Plaintiff presented to Dr. Cruz with normal memory, full orientation, appropriate mood and affect, and normal insight and judgment. (AR 621.) Additionally, on May 1, 2018, Plaintiff presented as alert x3, with normal speech, normal affect, normal judgment/insight, normal mood, and was pleasant and conversational. (AR 21-22.) The Court finds the ALJ's statement to be a specific and legitimate reason supported by substantial evidence. See Alvarez v. Berryhill, No. 3:17-CV-2236-AJB-NLS, 2019 WL 3574446, at *5 (S.D. Cal. Aug. 6, 2019) (ALJ provided specific and legitimate reasons for rejecting physician opinion including that "opinion was inconsistent with objective findings showing Plaintiff oriented and with normal mental status evaluations."); Rodriguez v. Colvin, No. CV 12-06230-MAN, 2014 WL 292227, at *7 (C.D. Cal. Jan. 24, 2014) ("Further, the ALJ properly notes that the treating physicians' treatment notes are inconsistent with other progress notes showing that plaintiff is oriented in all spheres, is alert, and denies delusions and hallucinations [and] [t]hus, the ALJ provided a specific and legitimate reason for rejecting the opinions of plaintiff's treating physicians."); Neal v. Astrue, No. 1:11-3073-AA, 2012 WL 3779028, at *5 (D. Or. Aug. 29, 2012) (finding the ALJ provided specific and legitimate reasons for rejecting physician opinion including citing clinical exams stating appropriate alertness, affect, memory and judgment.).

For the above stated reasons, the Court finds the ALJ provided specific and legitimate

1  reasons for discounting the opinions of Dr. Izzi and Dr. Portnoff.

2  **b.    The ALJ's Weighing of the Opinions and Evidence was Based on Substantial**
   **Evidence and any Error is Harmless**
3

4      As to Plaintiff's more general argument that the ALJ substituted her own lay findings for

5  those of the consultative examiners, or that the state non-examining physician opinions were

6  outdated compared to the latest consultative exam, such arguments are unpersuasive.  Plaintiff's

7  arguments when viewed in conjunction with the ALJ's summary and analysis of the evidence and

8  medical opinions as a whole only demonstrate conflicts in the medical record, and while Plaintiff

9  disagrees with the conclusions the ALJ reached, the ALJ adequately considered the longitudinal

10 record pertaining to mental limitations (AR 72), weighed the conflicting doctor's opinions (AR

11 72-73), and made a determination supported by substantial evidence in the record in assigning

12 reduced weight to some of the opinions, and assigning greater weight to other opinions (AR 73).

13 See Magallanes, 881 F.2d at 751; Morgan, 169 F.3d at 603.

14     To the extent the ALJ may have erred in stating no objective evidence supported the

15 opined social limitations, such error is harmless because the ALJ provided other specific and

16 legitimate reasons for discounting Dr. Izzi's and Dr. Portnoff's opinions.  Further, any error

17 would be harmless because a limitation to simple and routine tasks adequately encompasses a

18 moderate limitation on social functioning.  See Rogers v. Comm'r of Soc. Sec. Admin., 490 F.

19 App'x 15, 17-18 (9th Cir. 2012) (ALJ's RFC assessment that did not expressly include moderate

20 difficulties in social functioning but limited claimant to simple, routine tasks was consistent with

21 the opined moderate social limitations); Gann v. Berryhill, No. 1:17-CV-00325-SKO, 2018 WL

22 2441581, at *10 (E.D. Cal. May 31, 2018) ("A limitation to simple tasks performed in unskilled

23 work adequately encompasses moderate limitations with social functioning including getting

24 along with peers and responding appropriately to supervisors."); Messerli v. Berryhill, No. 1:16-

25 CV-00800-SKO, 2017 WL 3782986, at *11 (E.D. Cal. Aug. 31, 2017) ("The Ninth Circuit has

26 similarly concluded a limitation to simple tasks performed in unskilled work adequately

27 encompasses moderate limitations with social functioning."); Menges v. Berryhill, No. 1:16-CV-

28 01766-BAM, 2018 WL 1567786, at *8 (E.D. Cal. Mar. 30, 2018) ("A restriction to simple,

repetitive tasks amply accounts for any moderate/mild limitations in mental or social functioning."); <u>Henry v. Colvin</u>, No. 1:15-CV-00100-JLT, 2016 WL 164956, at *18 (E.D. Cal. Jan. 14, 2016) (holding "the restriction to simple tasks encompasses Plaintiff's moderate limitations with dealing with changes, social interaction, and low stress tolerance.").

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err in assigning reduced weight to the opinions of the consultative examiners who opined on Plaintiff's physical and mental limitations and the ALJ's findings are based on substantial evidence. Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment appealing the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Jesse Ramirez. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: **September 4, 2019**

_____
UNITED STATES MAGISTRATE JUDGE